NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12080


   TIMOTHY P. CHAMBERS[1] & another[2] vs.  RDI LOGISTICS, INC., &
   another;[3] DEE & LEE, LLC, & another,[4] third-party defendants.



        Bristol.     October 5, 2016. - December 16, 2016.

     Present:  Gants, C.J., Botsford, Lenk, Hines, Gaziano, Lowy,
                          & Budd, JJ.



Independent Contractor Act.  Federal Preemption.  Statute,
     Federal preemption, Severability.  Practice, Civil, Summary
     judgment, Standing.  Employment, Retaliation.  Protective
     Order.



     Civil action commenced in the Superior Court Department on
September 20, 2013.

     An emergency motion for a protective order was considered
by Richard T. Moses, J.; a motion for reconsideration was
considered by him; and the case was heard by him on motions for
summary judgment.


———————————————————

     [1] Individually and on behalf of all others similarly
situated.

     [2] Leroy Johnson, individually and on behalf of all others
similarly situated.

     [3] Richard J. Deslongchamps, Jr.

     [4] Three T & C Transport, Inc.

The Supreme Judicial Court granted an application for direct appellate review.

Harold L. Lichten (Peter M. Delano with him) for the plaintiffs.

Michael T. Grant (Andrew J. Fay with him) for the defendants.

LENK, J.  We are called upon in this case chiefly to consider whether G. L. c. 149, § 148B, the independent contractor statute, is preempted by the Federal Aviation Administration Authorization Act of 1994 (FAAAA), 49 U.S.C. § 14501(c).  The plaintiffs, who contracted with the defendants through small corporations that the plaintiffs apparently formed for this purpose, performed services in Massachusetts as furniture delivery drivers.  They brought this putative class action against the defendants under the independent contractor statute, asserting that they had been misclassified as independent contractors.  Following the addition of other claims and counterclaims, summary judgment entered for the defendants dismissing the plaintiffs' claims on the ground that they were preempted by the Federal statute.

We conclude that, while a portion of the independent contractor statute is preempted by the FAAAA, the remainder is severable and remains applicable to the plaintiffs' misclassification claim.  Nor is summary judgment dismissing that claim warranted on the separately asserted basis that the

plaintiffs lack standing as individuals to assert claims for misclassification under the statute. Material issues of disputed fact preclude the entry of summary judgment on either basis. We conclude similarly that the dismissal, without explanation, of the claim of retaliation that Timothy Chambers individually asserts under G. L. c. 149, § 148A, was improper.

Finally, we review the denial of the plaintiffs' request for a protective order, brought in the wake of the defendants' communications with putative class members in which they were offered payments in exchange for signed releases. While discerning no abuse of discretion requiring reversal in these circumstances, we acknowledge the legitimate concerns raised by such communications and the authority of a judge to enter appropriate protective orders when necessary.

1. Background. Since this case concerns a grant of summary judgment, we "summarize the relevant facts in the light most favorable to the plaintiff[s]." Somers v. Converged Access, Inc., 454 Mass. 582, 584 (2009). RDI Logistics, Inc. (RDI), is a furniture delivery company headquartered in South Easton. Richard Deslongchamps, Jr., is the founder and president of RDI. The company provides "last mile" delivery services for large retail furniture companies.[5] The plaintiffs

---

[5] "Last mile" delivery services consist of delivery from a warehouse where furniture is stored to individual customers.

delivered furniture for RDI for several years on a full-time basis, working approximately sixty hours per week over five or six days. Since RDI only does business with independent business entities, the plaintiffs incorporated prior to entering into contracts with RDI.[6] The contracts contained both nonsolicitation and noncompete clauses, which effectively prevented the plaintiffs from performing any delivery work for RDI's competitors during their tenure with the company and for three years thereafter.

RDI's managers informed the plaintiffs that their contracts would be terminated if they worked for any company other than RDI. The company also required the plaintiffs to wear uniforms and to display signs on their trucks bearing either RDI's logo or the logos of RDI's customers. RDI deducted from the plaintiffs' pay the costs of uniforms, truck lease payments, and damage allegedly done to customers' property in the course of their deliveries. RDI also regulated how the plaintiffs loaded the furniture on their trucks, which customers they delivered to, and the specific windows of time in which they were to deliver their goods to customers. Finally, RDI required that the plaintiffs follow prescribed routes to reach their customers

---

[6] Johnson and his then partner, Daryl McConaga, formed Dee & Lee, LLC, in August, 2007. Chambers formed Three T & C Transport, Inc., in early 2009. RDI filed a third-party complaint for indemnity against both of these entities.

and use global positioning system devices to ensure that the plaintiffs did not deviate from their assigned routes.

After approximately four years of service, RDI terminated its contract with Johnson's company in December, 2011, under disputed circumstances.[7]  During the summer of 2013, Chambers informed his fellow drivers at RDI that he suspected that RDI was misclassifying them as independent contractors rather than as employees.  In August, 2013, RDI informed Chambers that his contract was subject to a sixty-day review period.[8]  On the evening of September 18, 2013, Deslongchamps confronted Chambers and accused him of attempting to file a lawsuit under the independent contractor statute.  After a brief argument, Deslongchamps fired Chambers.

Two days later, the plaintiffs filed a class action complaint against RDI and Deslongchamps, individually, alleging misclassification.  In October, 2013, they filed an amended complaint, adding a claim for unjust enrichment stemming from the purported misclassification, as well as an individual claim on behalf of Chambers alleging retaliation under G. L. c. 149,

---

[7] Although the record is not clear on the circumstances surrounding this issue, it appears that RDI terminated Johnson for failing to wear his seat belt while making deliveries.

[8] The parties alternatively refer to this notice as a "60-day termination notice."  It is not clear in the record whether the notice explicitly provided for the termination of Chambers's contract.

§ 148A. The defendants asserted two counterclaims for breach of contract against Johnson, maintaining that he had violated a release of claims against RDI that he signed upon his termination. They also filed a third-party complaint against the plaintiffs' respective corporations, asserting that the contracts between those corporations and RDI indemnified RDI against any damages resulting from the plaintiffs' claims.

In July of 2014, the parties engaged in an unsuccessful mediation effort. Three months later, as discovery was underway, RDI sent a series of letters on an ex parte basis to certain current and former RDI contractors. Each letter contained a check for $1,000 that would, if endorsed, purportedly release all claims against RDI. The two-page letters, in essence, stated that two individuals had filed a class action complaint against RDI in which they claimed that they were misclassified as independent contractors. The letters, which contained the Superior Court case caption, noted that although "RDI believes firmly that it has not acted improperly with regard" to its classification of its workers, it would offer "a one-time payment in exchange for a release" of any claims relating, inter alia, to the classification of those workers.

On learning of these letters, the plaintiffs sought an emergency protective order barring RDI from engaging in further

communications with "putative class members." They asked the judge to strike "any alleged settlements obtained as the result of the letters and checks" that had been mailed. The motion was denied. A few months later, the plaintiffs filed a motion for reconsideration of their emergency motion, claiming that an RDI driver had informed the plaintiffs' counsel that he and his fellow drivers feared they would lose their contracts with RDI if they did not endorse the checks. The judge denied that motion. The plaintiffs sought interlocutory review before a single justice of the Appeals Court, which also was denied.

Two weeks later, the plaintiffs moved for partial summary judgment on their misclassification claim. In response, the defendants filed a cross motion for summary judgment on all of the plaintiffs' claims, along with their claims against Johnson and the plaintiffs' companies. The judge denied the plaintiffs' motion and allowed the defendants' motion on the ground that the FAAAA preempted the independent contractor statute in its entirety.[9] The plaintiffs' complaint was dismissed, along with the defendant's claims against Johnson and the plaintiffs'

---

[9] The parties do not reference the plaintiffs' unjust enrichment claim, and the judge did not provide a reason for its dismissal. We assume that the claim was dismissed concurrently with the misclassification claim. Accordingly, we reverse the dismissal of that claim.

companies.[10]  We allowed the plaintiffs' application for direct appellate review.

2.  Discussion.  a.  Summary judgment.  The defendants claim that they are entitled to judgment as a matter of law on all of the plaintiffs' claims.  They contend that the plaintiffs' misclassification claim fails for two reasons.  First, they suggest that the statute is preempted by the FAAAA.  Second, they argue that the plaintiffs do not have standing under the independent contractor statute because their contracts with RDI were through corporate entities.  The defendants also suggest that Chambers' retaliation claim fails because he does not have standing unless he proves that he is an employee.

i.  Standard of review.  "We review a grant of summary judgment de novo to determine 'whether, viewing the evidence in the light most favorable to the nonmoving party, all material facts have been established and the moving party is entitled to judgment as a matter of law.'"  DeWolfe v. Hingham Centre, Ltd., 464 Mass. 795, 799 (2013), quoting Juliano v. Simpson, 461 Mass.

---

[10] The judge dismissed the defendants' counterclaims against Johnson and the plaintiffs' corporations because they were rendered moot after summary judgment issued on the misclassification claim.  Given our reversal of the award of summary judgment, the defendants' claims are no longer moot.  See Donahue v. Boston, 304 F.3d 110, 121 (1st Cir. 2002) (reversing Federal District Court's denial of plaintiffs' motion on mootness grounds, after having vacated that court's order allowing summary judgment for defendant).  Accordingly, we vacate the dismissal of the defendants' counterclaims.

527, 529-530 (2012). Because we review this matter de novo, "no deference is accorded the decision of the judge in the trial court." Federal Nat'l Mtge. Ass'n v. Hendricks, 463 Mass. 635, 637 (2012).[11] The defendants, as the moving parties, bear the "burden of establishing that there is no genuine issue as to any material fact and that they are entitled to judgment as a matter of law." DeWolfe, supra.

ii. Misclassification claim. A. Independent contractor statute. The independent contractor statute "establishes a standard to determine whether an individual performing services for another shall be deemed an employee or an independent contractor for purposes of our wage statutes."[12] Somers v. Converged Access, Inc., 454 Mass. 582, 589 (2009). "Under this standard, '"an individual performing any service" is presumed to be an employee'" (citations omitted). Sebago v. Boston Cab Dispatch, Inc., 471 Mass. 321, 327 (2015). "The purpose of the independent contractor statute is 'to protect workers by classifying them as employees, and thereby grant them the benefits and rights of employment, where the circumstances

---

[11] The plaintiffs ask this court to allow their motion for summary judgment on each claim at issue before us. We decline to do so. See Maxwell v. AIG Domestic Claims, Inc., 460 Mass. 91, 97 (2011) ("Denial of a motion for summary judgment is interlocutory and hence not subject to an appeal as of right").

[12] The independent contractor statute most recently was amended in 2004. See St. 2004, c. 193, § 26. The statute was first enacted in 1990. See St. 1990, c. 464.

indicate that they are, in fact, employees" (citation omitted).
Depianti v. Jan-Pro Franchising Int'l, Inc., 465 Mass. 607, 620
(2013).

To establish that a presumptive employee is actually an
independent contractor, an employer must prove that

> "(1) the individual is free from control and direction
> in connection with the performance of the service, both
> under his contract for the performance of service and in
> fact; and

> "(2) the service is performed outside the usual course
> of the business of the employer; and

> "(3) the individual is customarily engaged in an
> independently established trade, occupation, profession or
> business of the same nature as that involved in the service
> performed."

G. L. c. 149, § 148B.  To "rebut the presumption of employment,"
an employer must satisfy all three of these prongs.  Depianti,
465 Mass. at 621.

B.  The FAAAA.  In enacting the FAAAA in 1994, Congress
sought to deregulate the trucking industry.  See Dan's City Used
Cars, Inc. v. Pelkey, 133 S. Ct. 1769, 1775 (2013).  Congress
acted based on a finding "that [S]tate governance of intrastate
transportation of property had become 'unreasonably
burden[some]' to 'free trade, interstate commerce, and American
consumers.'"  Id., quoting Columbus v. Ours Garage & Wrecker
Serv., Inc., 536 U.S. 424, 440 (2002).  Toward that end,
Congress included a preemption clause in the statute that

expressly preempts any State "law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property."  49 U.S.C. § 14501(c)(1) (2012).

"The critical question in any preemption analysis is always whether Congress intended that [F]ederal [law] supersede [S]tate law" (citation omitted).  Bay Colony R.R. v. Yarmouth, 470 Mass. 515, 518 (2015).  While Congress's intent to preempt State law under the FAAAA is explicit, "that 'does not immediately end the inquiry because the question of the substance and scope of Congress'[s] displacement of [S]tate law still remains.'"  Id., quoting Altria Group, Inc. v. Good, 555 U.S. 70, 76 (2008).

In order to determine this scope, we "focus first on the statutory language, 'which necessarily contains the best evidence of Congress['s] pre-emptive intent'" (citation omitted).  Dan's City Used Cars, Inc., 133 S. Ct. at 1778.  The breadth of the FAAAA's preemption clause is "purposefully expansive."  Massachusetts Delivery Ass'n v. Coakley, 769 F.3d 11, 18 (1st Cir. 2014).  Any State laws "'having a connection with, or reference to,' carrier '"rates, routes, or services," are pre-empted'" (citation omitted).  Rowe v. New Hampshire Motor Transp. Ass'n, 552 U.S. 364, 370 (2008).

Congress's overarching goal in establishing such expansive preemption was twofold.  First, it aimed to "ensure

transportation rates, routes, and services that reflect[ed] 'maximum reliance on competitive market forces,' thereby stimulating 'efficiency, innovation, and low prices,' as well as 'variety' and 'quality'" (citation omitted). Id. at 371. Second, Congress wanted to sweep aside "a patchwork of [S]tate service-determining laws, rules, and regulations" that would undercut this goal. Id. at 373.

The United States Supreme Court has interpreted the FAAAA's preemptive effect broadly, concluding that preemption occurs "at least where [S]tate laws have a 'significant impact' related to Congress'[s] deregulatory and pre-emption-related objectives" (citation omitted). Id. at 371. Despite its expansive ambit, however, the FAAAA's preemption is not unlimited. State laws that "affect fares in only a 'tenuous, remote, or peripheral . . . manner'" are not preempted (citation omitted). Id.

The defendants contend that the FAAAA preempts the independent contractor statute for two reasons. First, they contend that the FAAAA preempts the statute because the second prong of G. L. c. 149, § 148B (prong two), dictates that motor carriers such as RDI perform their services using employees rather than independent contractors. They also argue that prong two cannot be severed from the statute because the Legislature drafted the statute as a conjunctive test with three inseparably

intertwined prongs.  Second, the defendants argue that the FAAAA preempts the application of the independent contractor statute to motor carriers such as RDI because enforcement of the plaintiffs' misclassification claim would have an impermissible impact on motor carriers' services.[13]

C.  Prong two.  The defendants are correct that prong two draws the independent contractor statute into the gravitational pull of the FAAAA's preemption.  Prong two provides an impossible standard for motor carriers wishing to use independent contractors.  This de facto ban constitutes an impermissible "significant impact" on motor carriers that would undercut Congress's objectives in passing the FAAAA; the statute containing prong two also forms part of an impermissible "patchwork" of State laws due to its uniqueness.  See Rowe, 552 U.S. at 371, 373.

A delivery driver for a motor carrier necessarily will be performing services within "the usual course of the business of the employer" whenever a court concludes that delivery services

_____

[13] Before turning to analysis, we denote the limited scope of the defendants' challenge to the independent contractor statute.  The issue here is not whether the independent contractor statute is facially preempted, but rather whether the FAAAA preempts the independent contractor statute, in whole or in part, as applied to motor carriers such as the defendants. See, e.g., California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., 519 U.S. 316, 319 (1997). Accordingly, the application of the independent contractor statute to entities other than motor carriers will be unaffected by this decision.

are part of its usual course of business.  See G. L. c. 149, § 148B (a) (2).  Prong two thereby, in essence, requires that motor carriers providing delivery services, such as RDI, use employees rather than independent contractors to deliver those services.  As a result, motor carriers are compelled to adopt a different manner of providing services from what they otherwise might choose because prong two dictates the type of worker that will provide the services.  This likely also would have a significant, if indirect, impact on motor carriers' services by raising the costs of providing those services.  See, e.g., G. L. c. 151, § 1 (requiring that employers pay employees minimum wage).  The statute containing prong two therefore contravenes the objectives of Congress in enacting the FAAAA by "substitut[ing] . . . its own governmental commands for 'competitive market forces' in determining (to a significant degree) the services that motor carriers will provide."  Rowe, 552 U.S. at 372.

Moreover, with prong two included, the statute contravenes the congressional objective of preventing a "patchwork of [S]tate service-determining laws."  Id. at 371.  Unlike the first and third prongs, prong two "stands as something of an anomaly" amongst State laws regulating the classification of workers.  Schwann v. FedEx Ground Package Sys., Inc., 813 F.3d 429, 438 (1st Cir. 2016).  Very few States have enacted such a

test, which explicitly hinges employee status on the connection between the services performed by the worker and the employer's usual course of business. Id., and cases cited. The provision's distinctiveness both undercuts Congress's intent to prevent "a patchwork of [S]tate service-determining laws, rules, and regulations," Rowe, supra, and suggests that Congress did not intend to allow such provisions to stand as a "type of pre-existing and customary manifestation of the [S]tate's police power." Schwann, supra.

D. Severability of prong two. The defendants take the view that the prongs of the independent contractor statute are nonseverable because they operate conjunctively and are inextricably intertwined. They argue that, given that prong two of the independent contract statute triggers the FAAAA's preemption, the entire statute, on this view, must fall. This contention fails for several reasons.

When compelled to strike down part of a statute, the court will, "as far as possible, . . . hold the remainder to be constitutional and valid, if the parts are capable of separation and are not so entwined that the Legislature could not have intended that the part otherwise valid should take effect without the invalid part." Massachusetts Wholesalers of Malt Beverages, Inc. v. Commonwealth, 414 Mass. 411, 420 (1993), quoting Boston Gas Co. v. Department of Pub. Utils., 387 Mass.

531, 540 (1982). "On the other hand, '[i]f the court is unable to know whether the Legislature would have enacted a particular bill without the unconstitutional provision, it will not sever the unconstitutional provision, but will strike the entire statute'" (citation omitted). Murphy v. Commissioner of the Dep't of Indus. Accs., 418 Mass. 165, 169 (1994).

The initial inquiry in determining the severability of the independent contractor statute is whether the statute is "capable of separation." Massachusetts Wholesalers of Malt Beverages, Inc., 414 Mass. at 420. A statute is capable of separation when, as here, the severed provision "is not so connected with and dependent upon other clauses of the act as to constitute an essential factor of the whole." Petition of Worcester County Nat'l Bank of Worcester, 263 Mass. 394, 400 (1928). Although the prongs of the independent contractor statute are conjunctive, they operate independently of one another. The statute as severed would provide two independent tests that motor carriers would have to meet in order to establish that their workers are independent contractors.

The defendants contend nonetheless that the statute is "so entwined that the Legislature could not have intended that the part otherwise valid should take effect without the invalid part" (citation omitted). Murphy, 418 Mass. at 169. While the independent contractor statute is itself silent on the issue of

severability, the Legislature has stated generally that "[t]he provisions of any statute shall be deemed severable, and if any part of any statute shall be adjudged unconstitutional or invalid, such judgment shall not affect other valid parts thereof." G. L. c. 4, § 6, Eleventh. There is, then, a presumption in favor of the severability of the statute. See Peterson v. Commissioner of Revenue, 444 Mass. 128, 138 (2005).

The question thus becomes whether upholding the statute as severed would frustrate the legislative purpose of the independent contractor statute. That purpose is "to protect workers by classifying them as employees, and thereby grant them the benefits and rights of employment, where the circumstances indicate that they are, in fact, employees." Taylor v. Eastern Connection Operating, Inc., 465 Mass. 191, 198 (2013). In enacting the statute, the Legislature intended to provide greater protection than did the common-law "right to control" test that previously governed misclassification claims. See, e.g., Commonwealth v. Savage, 31 Mass. App. Ct. 714, 717 (1991).

Since the "right to control" test is incorporated in the first prong of the statute, the practical effect of striking the statute if it were not severable would be to eliminate the third prong, the so-called "independent business" test. The elimination of that test, and the return to the status quo ante, cannot be readily reconciled with the Legislature's intent to

provide additional safeguards for the Commonwealth's workers beyond that test.  We agree with the United States Court of Appeals for the First Circuit that the Legislature would have preferred "two-thirds of this loaf over no loaf at all" in order to provide the most protection for workers in the Commonwealth. See Schwann, 813 F.3d at 441 (concluding independent contractor statute is severable under Massachusetts law).[14]

E.  The statute as severed.  The defendants contend in the alternative that the FAAAA preempts the independent contractor statute, even as severed, because the enforcement of the plaintiffs' claims would have some impact on the defendants' services.

The statute as severed, applying only the first and third prongs, does not have "a 'significant impact' related to Congress'[s] deregulatory and pre-emption-related objectives" (citation omitted), Rowe, 552 U.S. at 371, because it does not target or restrict motor carriers in any way.  Motor carriers,

---

[14] The defendants point to several instances in which the Legislature has considered and rejected amendments to the independent contractor statute that purportedly would have had the effect of rendering prong two severable.  None of these amendments, however, directly addressed the issue of severability.  Rather, they were attempts to substantively alter the provisions of the statute.  We cannot conclude that, in rejecting these proposed amendments, the Legislature intended that the independent contractor statute be nonseverable.  Cf. Cook v. Patient Edu, LLC, 465 Mass. 548, 555 n. 14 (2013) ("We do not draw conclusions concerning the intent of the Legislature based on the failure to enact a subsequent amendment").

like any other industry, may structure their business model to use either independent contractors or employees. The first prong requires that an employer prove that a worker is "free from control and direction in connection with the performance of the service," both contractually and factually, in order to establish that a worker is an independent contractor. See G. L. c. 149, § 148B (a) (1). The third prong requires, in turn, that, to be an independent contractor, "the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed." G. L. c. 149, § 148B (a) (3). Unlike prong two, there is nothing intrinsic to these provisions that prevents motor carriers from using independent contractors. To the extent that the first and third prongs have an effect on motor carriers, we conclude that such an effect is too "indirect, remote, and tenuous" to trigger the FAAAA's preemption. See, e.g., Californians For Safe & Competitive Dump Truck Transp. v. Mendonca, 152 F.3d 1184, 1189 (9th Cir. 1998), cert. denied, 526 U.S. 1060 (1999) (upholding California's prevailing wage law against FAAAA preemption claim).

Moreover, the statute as severed represents exactly the sort of traditional exercises of State police power where preemption is presumptively disfavored. See New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins.

Co., 514 U.S. 645, 655 (1995) ("where [F]ederal law is said to bar [S]tate action in fields of traditional [S]tate regulation, . . . we have worked on the 'assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress'" [citation omitted]).  While the uniqueness of prong two, and its significant impact on motor carriers, suffices to overcome this presumption, the statute with only prongs one and threethe first and third prongs falls into the category of "generally applicable background regulations" that Congress presumptively does not intend to preempt.  See Dilts v. Penske Logistics, LLC, 769 F.3d 637, 646 (9th Cir. 2014), cert. denied, 135 S. Ct. 2049 (2015).

Finally, without prong two, the statute contains only commonly used State and Federal tests of employment, indicating that it does not fall within the intended scope of the FAAAA's preemption.[15]  In enacting the FAAAA, Congress was concerned with

_____

[15] At least sixteen other States have enacted a statute using similar language to that in the first and third prongs of G. L. c. 149, § 148B -- the right to control and independent business tests -- to determine whether workers are employees or independent contractors.  See Ark. Code Ann. § 11-10-210(e) (2016); Colo. Rev. Stat. § 8-70-115(1)(b) (2016); Conn. Gen. Stat. § 31-222(a)(1)(B) (2016); Del. Code Ann. tit. 19, § 3302(10) (2016); Idaho Code Ann. § 72-1316(4) (2016); La. Rev. Stat. Ann. § 23:1472(12)(E) (2016); Me. Rev. Stat. tit. 26, § 1043(11)(E) (2016); Nev. Rev. Stat. § 612.085 (2016); N.M. Stat. Ann. § 51-1-42(F)(5) (2016); 43 Pa. Stat. Ann.

State laws that created a "patchwork" of differing State regulations that would interfere with "the competitive marketplace." Rowe, 552 U.S. at 373. State laws that are "more or less nationally uniform" do not pose a "patchwork problem." Schwann, 813 F.3d at 440.

The defendants' contention that the statute if severed nonetheless would be preempted rests on the untenable view that the FAAAA preempts any State regulation that, if enforced, would have any impact on motor carriers. In advancing this

---

§ 753(l)(2)(B) (2016); S.D. Codified Laws § 61-1-11 (2016); Tenn. Code Ann. § 50-7-207(e)(1) (2016); Utah Code Ann. § 35A-4-204(3) (LexisNexis 2016); Vt. Stat. Ann. tit. 21, § 1301(6)(B) (2016); Wash. Rev. Code § 50.04.140 (2016); W. Va. Code § 21A-1A-16(7) (2016).

Additionally, the test to determine employment under the Fair Labor Standards Act, 29 U.S.C. §§ 201-219 (2012) (FLSA), also includes analysis similar to the first and third prongs of G. L. c. 149, § 148B. See, e.g., Donovan v. Brandel, 736 F.2d 1114, 1117, 1120 (6th Cir. 1984) (noting that degree of purported employer's control and economic dependence of worker on employer are both relevant to determining employment under FLSA). In a majority of States, the common-law test incorporates the right to control analysis of the first prong, and in some States, the test also incorporates the independent business analysis of the third prong. See Feary, Independent Contractor Employment Classification: A Survey of State and Federal Laws in the Motor Carrier Industry, 35 Transp. L.J. 139, 146-148 (2008). Finally, the language in the first and third prongs is integral to parts of the Federal Internal Revenue Service test to determine employment. See Rev. Rul. 87-41, 1987-1 C.B. 296 (setting forth twenty-factor test to determine employment status, which includes level of control exercised by employer and whether worker works full time for that employer).

contention, the defendants rely primarily on the United States Supreme Court's decision in Northwest, Inc. v. Ginsberg, 134 S. Ct. 1422 (2014). They mistakenly interpret Ginsberg as a pronouncement that the application of any State law to motor carriers is preempted if it would have even a tangential impact on their provision of services. The Ginsberg Court held that the FAAAA preempted a plaintiff's State law claim for breach of the covenant of good faith and fair dealing against an airline for terminating his membership in its frequent flyer program. See id. at 1426-1427. The claim at issue in Ginsberg, however, directly concerned services provided by the airline -- admission to the frequent flyer program and its attendant benefits. See id. at 1430-1431. Hence, the forbidden connection under the FAAAA was obvious: the plaintiffs' requested relief consisted of better services at a lower rate.

What Ginsberg teaches is that State laws are "more likely to be preempted when they operate at the point where carriers provide services to customers at specific prices." Dilts, 769 F.3d at 646. Here, by contrast, the plaintiffs' misclassification claim is not directly related to the defendant's "services," but relates instead to a "generally applicable background regulation[] . . . several steps removed from prices, routes, or services." Id. This tenuous connection to services does not, without more, fall within the FAAAA's

preemptive scope.  See <u>New York State Conference of Blue Cross &
Blue Shield Plans</u>, 514 U.S. at 655 ("If 'relate to' were taken
to extend to the furthest stretch of its indeterminacy,
then . . . Congress's words of limitation [would be] a mere
sham").  If the FAAAA preempted any regulation that could result
in an effect on motor carriers, the defendants would be exempt
from all State regulation, a result that the FAAAA clearly does
not countenance.[16]  See <u>Dan's City Used Cars, Inc.</u>, 133 S. Ct. at
1778 ("the breadth of the words "related to" [in the FAAAA] does
not mean the sky is the limit").

Because there are material facts in dispute as to the
plaintiffs' claims under the statute as severed, summary
judgment should not have been allowed on the plaintiffs'
misclassification claim.

F.  <u>Plaintiffs' standing</u>.  The defendants contend that the
grant of summary judgment on the plaintiffs' misclassification
claims was warranted for the separate reason that the plaintiffs

---

[16] Indeed, the FAAAA's preemption clause explicitly exempts
several areas of State regulation that could result in an
increase in costs for motor carriers.  For example, the FAAAA
explicitly allows State regulation of motor carriers related to,
inter alia, "motor vehicles," "highway route controls,"
"limitations based on the size or weight of the motor vehicle,"
and "insurance requirements."  See 49 U.S.C. § 14501(c)(2)(A).
This list was not "intended to be all inclusive, but merely to
specify some of the matters that are not 'prices, rates or
services' and which are therefore not preempted."  H.R. Conf.
Rep. 103-677, 103d Cong., 2d sess. (1994), reprinted in 1994
U.S.C.C.A.N. 1715, 1756.

lack standing to bring such claims. The defendants maintain in this regard that the protections of the independent contractor statute apply only to "individuals" who perform services as such. See G. L. c. 149, § 148B ("For the purpose of this chapter and chapter 151, an individual performing any service, except as authorized under this chapter, shall be considered to be an employee . . ."). They argue that the plaintiffs, in contracting with RDI through corporate entities, foreclosed any claim for misclassification. Because the relevant facts are in dispute, however, summary judgment on this basis is unwarranted.

The defendants urge that the plaintiffs ceded standing under the independent contractor statute because they purposefully chose and financially benefited from using the corporate form. They construe the statutory reference to "individuals who provide services" as meaning that only workers who provide services as individuals have standing. In so limiting the scope of the statute, the defendants cite to an advisory from the Attorney General stating that "legitimate independent contractors and business-to-business relationships in the Commonwealth . . . will not be adversely impacted by [the independent contractor statute]." See Advisory 2008/1, Attorney General's fair labor and business division.

The statutory reference to "individuals who provide services," however, does not expressly exclude individuals who

provide services through a corporation.  The Attorney General's advisory, which the defendants emphasize reflects this understanding, notes as well that "businesses . . . created and maintained in order to avoid [application of the independent contractor statute]" would not immunize employers against enforcement.[17]  The Attorney General articulated certain factors material to a determination whether the corporate form represents a legitimate business-to-business relationship, or one whose raison d'etre is to prevent the classification of workers as employees:

> "[Whether] the services of the alleged independent contractor are not actually available to entities beyond the contracting entity, even if they purport to be so; whether the business of the contracting entity is no different than the services performed by the alleged independent contractor; or the alleged independent contractor is only a business requested or required to be so by the contracting entity."

Id.  This nonexhaustive list of factors properly focuses on whether the worker's use of the corporate form was at the worker's behest or forced upon the worker by an employer in order to misclassify him or her.  See Anderson vs.

---

[17] "Insofar as the Attorney General's office is the department charged with enforcing the wage and hour laws, its interpretation of the protections provided thereunder is entitled to substantial deference, at least where it is not inconsistent with the plain language of the statutory provisions."  Smith v. Winter Place LLC, 447 Mass. 363, 367-368 (2006).

Homedeliveryamerica.com, Inc., U.S. Dist. Ct., No. 11-10313-GAO (D. Mass. Dec. 30, 2013).

Here, the plaintiffs have alleged enough facts to establish a genuine issue of material fact as to whether they have standing under the independent contractor statute. They assert that they formed companies only to be able to contract with RDI, did not perform services for any companies other than RDI, and were forbidden from performing work for any companies other than RDI. These allegations raise the question whether the plaintiffs incorporated for their own benefit, as the defendants suggest, or whether RDI required them to incorporate in order to misclassify them as independent contractors. Summary judgment is precluded on this basis.

iii. Retaliation claim. Apparently due to the grant of summary judgment to the defendants dismissing the plaintiffs' misclassification claim on preemption grounds, Chambers's retaliation claim also was dismissed. The parties disagree whether the retaliation claim is independent of the misclassification claim, and whether it properly was dismissed.

General Laws c. 149, § 148A, provides that "[a]ny employer who discharges or in any other manner discriminates against any employee because such employee . . . has instituted . . . any proceeding under or related to this chapter . . . shall have violated this section." Chambers claims that his contract with

RDI was terminated in retaliation for the assertion of his rights under the independent contractor statute, and that irrespective of whether he succeeds in establishing that he was misclassified as an independent contractor, he may pursue his claim for retaliation. By contrast, the defendants maintain that Chambers's retaliation claim properly was dismissed along with the misclassification claim, because G. L. c. 149, § 148A, only applies to workers classified as employees under the independent contractor statute. Insofar as we vacate the allowance of summary judgment on the plaintiffs' misclassification claim, Chambers's retaliation claim is revived, even under the defendants' suggested interpretation of the statute.[18] We leave for another day resolution of this dispute as to statutory interpretation.

b. Emergency motion for protective order and motion for reconsideration. The plaintiffs argue that the judge erred in denying their emergency motion for a protective order to enjoin RDI from contacting its workers and to invalidate any releases that were executed. They contend that the judge was obligated to allow their requests because the defendants' communications with its workers were misleading and coercive. We review the judge's denial of the motions to determine whether either

[18] The plaintiffs could succeed in establishing that they are misclassified employees.

constituted an abuse of his discretion.  See Merles v. Lerner, 391 Mass. 221, 226 (1984).  An abuse of discretion occurs when the judge's decision rests upon "a clear error of judgment in weighing the factors relevant to the decision . . . such that [it] falls outside the range of reasonable alternatives," or when the judge's decision constitutes a "significant error of law" (citations omitted).  Commonwealth v. Ellis, 475 Mass. 459, 476 (2016).

The plaintiffs filed their motion under Mass. R. Civ. P. 23 (d), 365 Mass. 767 (1974), which provides, in relevant part, that a court "may require such security and impose such terms as shall fairly and adequately protect the interests of the class in whose behalf the action is brought or defended."  "We have noted that [rule 23] '"was written in the light of [Fed. R. Civ. P. 23]," . . . hence case law construing the Federal rule is analogous and extremely useful'" (citations omitted).  Longval v. Commissioner of Correction, 448 Mass. 412, 417 n.9 (2007).

In Gulf Oil Co. v. Bernard, 452 U.S. 89, 100 (1981), where a protective order had been issued pursuant to Fed. R. Civ. P. 23(d), the United States Supreme Court concluded that "[b]ecause of the potential for abuse, a . . . court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties."  A protective order is appropriate to prevent

"[m]isleading or coercive communications with potential class members that could or are intended to undermine participation in a class or collective action." Davine vs. Golub Corp., U.S. Dist. Ct., No. 14-30136-MGM (D. Mass. Oct. 24, 2014), citing Gulf Oil Co., supra at 102. In this regard, courts should scrutinize with care instances in which employers send communications to class and putative class members who are their workers, given the heightened possibility of coercion between an employer and its workers. See Kleiner v. First Nat'l Bank of Atlanta, 751 F.2d 1193, 1202 (11th Cir. 1985). Moreover, when employers do send communications to class members, putative or otherwise, "it is critical that the class receive accurate and impartial information regarding the status, purposes and effects of the class action." Id.

Nonetheless, the United States Supreme Court made clear that a court's authority to issue protective orders is bound by the limits of the First Amendment to the United States Constitution. See Gulf Oil Co., 452 U.S. at 103 (striking down protective order as invalid restraint on expression). Accordingly, the issuance of a protective order "should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." Id. at 101. Additionally, the

issuance of a protective order must be "justified by a likelihood of serious abuses." Id. at 104.

In denying the plaintiffs' motions, the judge appears adequately to have taken these factors into account. The judge denied the plaintiffs' initial emergency motion because he concluded that "the subject correspondence issued to present and former drivers [for RDI] is neither misleading [n]or coercive and amply notifies recipients of the pending litigation." The plaintiffs' motion for reconsideration asserted similar grounds as their initial motion, with the addition of allegations that Deslongchamps had terminated Chambers in retaliation for asserting his rights under the independent contractor statute. The motion stated also that several unnamed affiants contacted the plaintiffs' counsel, stating that they feared retaliation from RDI if they did not endorse the checks. The judge denied the motion for reconsideration because "there [had] not been a sufficient showing that Chambers was terminated in violation of [G. L. c. 149, § 148A,] or that the defendants engaged in illegal coercive tactics in connection with the settlement of individual claims."

The judge's determination that the letters were not coercive or misleading such that they merited the issuance of a protective order was not unreasonable based on the record before him. The letters contained a citation to the plaintiffs' class

action and they fairly described the status of the case.

Additionally, the letters explicitly stated that RDI would not consider the employees' decision whether to endorse the check in business dealings unrelated to the matter. The letters also advised the recipients that they may wish to consult with an attorney before deciding whether to endorse the check. Finally, the fact that several drivers contacted the plaintiffs' counsel suggests that the letters provided sufficient information to allow such contact.

Absent further information suggesting that the communication was misleading or coercive, we conclude that the judge, on the record before him, did not abuse his discretion in denying the emergency motion for a protective order or the motion for reconsideration. We do not express a view as to the validity of the releases in question.[19]

3. Conclusion. The denials of the emergency motion for a protective order and the motion for reconsideration are affirmed, and the grant of summary judgment is vacated. The

---

[19] The validity of such releases and the judge's decision on a preliminary basis not to issue a protective order invalidating them are quite different matters. We note that releases "will be enforceable as to the statutorily provided rights and remedies conferred by the Wage Act only if such an agreement is stated in clear and unmistakable terms." Crocker v. Townsend Oil Co., 464 Mass. 1, 14 (2012). "[T]he release must be plainly worded and understandable to the average individual, and it must specifically refer to the rights and claims under the Wage Act that the employee is waiving." Id. Whether the releases here satisfy such criteria is not before us.

matter is remanded to the Superior Court for further proceedings consistent with this opinion.

<u>So ordered</u>.