NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

18-P-1404                                    Appeals Court

   JOEL WEISS  vs.  LOOMIS, SAYLES & COMPANY, INC., & another.[1]


No. 18-P-1404.

Suffolk.    September 11, 2019. - January 23, 2020.

Present:  Blake, McDonough, & Hand, JJ.


Independent Contractor Act.  Practice, Civil, Directed verdict.


        Civil action commenced in the Superior Court Department on
January 30, 2014.

        The case was tried before Christine M. Roach, J.


        Stephen S. Churchill (Brant Casavant also present) for the
plaintiff.
        James W. Bucking (Allison L. Anderson also present) for the
defendants.
        Stephen T. Melnick, Jennifer M. Duke, & Mary K. Sexton, for
Massachusetts Technology Leadership Council, Inc., amicus
curiae, submitted a brief.


        McDONOUGH, J.  Joel Weiss filed a single-count complaint in

the Superior Court, alleging that the defendants, Loomis Sayles

---

        [1] Loomis, Sayles & Company, L.P.

& Company, Inc., and Loomis Sayles & Company, L.P. (collectively, Loomis), misclassified him as an independent contractor rather than an employee. See G. L. c. 149, §§ 148B (§ 148B or independent contractor statute), 150. In the middle of the jury trial, after Loomis had moved for a directed verdict and had begun presenting evidence in its defense, the judge directed a verdict in favor of Loomis, the party with the burden of proof. We reverse.[2]

Evidence. In assessing the judge's order allowing Loomis's motion for a directed verdict, we summarize the evidence in the light most favorable to Weiss, the nonmoving party, while drawing all reasonable inferences in his favor. See Donaldson v. Farrakhan, 436 Mass. 94, 96 (2002). In 2010, a recruiter at Eliassen Group, LLC (Eliassen), a large information technology staffing firm, contacted Weiss about certain project-based work at Loomis, a financial services company.[3] Weiss, a software engineer with significant experience in the financial sector, was interested in the engagement. After Weiss signed, as

---

[2] We acknowledge the amicus brief submitted by the Massachusetts Technology Leadership Council, Inc.

[3] More specifically, Loomis is an asset management company that creates and manages custom investment portfolios for institutional clients. The particular project called for an individual to take over an application called Risk Insite, and to support and update it as necessary.

president of JoSol, Inc. (JoSol),[4] an independent contractor agreement (initial contractor agreement) with Eliassen, he interviewed with Loomis supervisors, Kevin McGuire and Luke Antolini. A decision was made that Weiss was a good fit for Loomis.

On August 4, 2010, Loomis entered into a "professional services vendor agreement" with Eliassen for "Joel Weiss for technology services." The initial contractor agreement between Weiss's company, JoSol, and Eliassen ran for three months. The parties subsequently extended the agreement on several occasions. The only JoSol employee authorized to provide services to Loomis was Weiss. On February 1, 2013, Loomis and Eliassen entered into a second "professional services vendor agreement" for "Joel Weiss for Technology Services." That contract, which ran through December 31, 2013, contained language stating that Weiss was "free to accept engagements from others during the term of this Agreement, so long as such actions [did] not impair [his] ability to perform his . . . services to Loomis Sayles." If Loomis had extended an offer of

---

[4] JoSol, Weiss's preexisting consulting company, had just two employees: Weiss and his wife, Sarah. Weiss opted to contract with Eliassen through JoSol because the corporation-to-corporation arrangement was a better overall financial deal than a direct relationship with Eliassen. Before the Loomis engagement, Eliassen required Weiss to furnish proof that JoSol was a legitimate business. Notably, Loomis never learned of the existence of JoSol.

employment, Weiss would have accepted it; Loomis provided its employees with a more generous benefit package than those available through JoSol and Eliassen.  Weiss, however, was not given that choice.

In September 2010, Weiss commenced work in Loomis's technology group.  Working in teams, the Loomis managers in the group created and oversaw projects to meet the needs of the Loomis investment professionals.[5]  As a member of McGuire's team, Weiss worked on a number of these team projects, creating and fixing information technology applications.  Weiss also worked on several projects of various lengths for other managers, including one spearheaded by John Gidman, Loomis's chief information officer (CIO).  In total, Weiss worked on at least fifteen Loomis projects.

Weiss reported, among others, to McGuire.  During their daily interactions, McGuire "would give [Weiss] direction" and Weiss would bring issues to McGuire.  The "powers that be" also assigned required tasks to Weiss as part of his daily job.  Weiss worked directly with the Loomis employees who used the applications, assisting with specific issues and upgrades.

---

[5] The investment professionals (portfolio managers, analysts, and traders) made up only thirty-five to forty percent of Loomis's total workforce of 680.

Loomis assigned Weiss to a cubicle directly across from McGuire's office and provided Weiss with a desk, computer, office supplies, a badge allowing building access, a Loomis picture identification card, a Loomis telephone number, and a Loomis e-mail address. Although Weiss had no set work hours, "the conventional wisdom" was that he should be in the office during business hours. For the first two years, Weiss worked five days per week in the office; during his final year, he worked at home, as did "most of the people [he] knew [at Loomis]," on Fridays and during holiday periods. When he worked at home, he used his personal laptop computer, which someone at Loomis helped him partition to keep his business work separate from his personal matters. He always alerted his Loomis supervisor to his whereabouts.

Weiss attended at least a couple of team-wide and project-specific meetings per week. All members of the team -- Loomis employees and contractors -- attended the team-wide meetings.[6] The contractors frequently communicated with Loomis managers and worked out the technical details of projects with them. On many occasions, Loomis converted contractors into employees.

---

[6] Loomis referred to the contractors, among other designations, as "consultants," "developers," "temps," and "vendors."

Each week, Weiss submitted time sheets signed by McGuire to Eliassen, which paid JoSol seventy-five dollars per hour; and from those proceeds, JoSol paid Weiss a salary.[7]  Loomis paid Eliassen $104 per hour for Weiss's services.  Loomis approved some of the contractors' direct requests for rate increases.

In Weiss's first year, McGuire had no objections to Weiss working overtime, and Weiss was permitted to work as many hours as he wanted.  Toward the end of Weiss's third year, Antolini, acting on Gidman's instruction, asked Weiss to keep his weekly hours under fifty.  Shortly after that conversation, Weiss was instructed not to log more than forty hours per week without prior approval from Gidman.

During Weiss's tenure, Loomis employed forty individuals in the technology group,[8] which had a budget of $50 million (approximately six to ten percent of Loomis's overall budget).  Loomis also staffed its technology group with eighty to one hundred independent contractors; many of these contractors worked full time at Loomis for years.  In fact, the Eliassen

---

[7] At some point, Weiss negotiated a four dollars per hour pay raise with Eliassen.

[8] The technology development professionals in the group consisted primarily of database engineers, database administrators, and software engineers.  McGuire was uncertain whether the individuals performing these services were employees or contractors.  There was evidence that the consultants were also unsure whether other workers in the technology group were contractors or Loomis employees.

recruiter informed Weiss that his contract was "open ended" and that he had "never had a consultant finish [at Loomis]." Loomis had never hired an independent contractor directly; contractors were required to first set up a contract with a staffing firm (such as Eliassen).

In the annual reports that Gidman prepared for Loomis's board of directors, he included the work of all the service providers among the achievements of the technology group. The names of the independent contractors, including Weiss, appeared in the organizational charts contained in those reports. Moreover, in a 2011 "organizational realignment" chart sent to the entire company, Gidman listed the names of the independent contractors, including Weiss, with the employees; he did so in order to communicate the full extent of the "expertise and resources" that could be utilized by the Loomis technology group.

For four weeks in December 2011, two weeks in January 2012, and three weeks in June 2012, Weiss worked on a cash flow project for the Commonwealth of Massachusetts. While working forty to sixty hours per week at Loomis, Weiss spent an additional ten to twenty hours per week on the Commonwealth's project. In September 2013, without explanation or notice, Loomis terminated Weiss. Weiss subsequently collected

unemployment benefits through JoSol.  Loomis was JoSol's last business engagement.

Discussion.  1.  Standard of review.  We review the allowance of a motion for a directed verdict to determine whether "anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff" (citation omitted).  Claudio v. Chicopee, 81 Mass. App. Ct. 544, 546 (2012).  A directed verdict in favor of the party with the burden of proof, here Loomis, should be granted only in "exceptional" cases.[9]  Brunelle v. W.E. Aubuchon Co., 60 Mass. App. Ct. 626, 630 (2004).

2.  Misclassification claim.  "Under § 148B (a), an individual who performs services shall be considered to be an employee, for purposes of G. L. c. 149 and G. L. c. 151, unless the employer satisfies its burden of proving by a preponderance of the evidence that '(1) the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in

---

[9] We have reminded trial judges that in close cases, "it is sound practice to deny the motion and to give the case to the jury, which may render the question academic by returning a verdict for the defendant.  If the jury finds for the plaintiff, the trial judge may, upon a motion for judgment [notwithstanding the verdict] reconsider and decide the issue previously presented by the motion for a directed verdict" (citation omitted).  Chapman v. Katz, 448 Mass. 519, 530 n.25 (2007).

fact; and (2) the service is performed outside the usual course of the business of the employer; and (3) the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.'" Somers v. Converged Access, Inc., 454 Mass. 582, 589 (2009), quoting G. L. c. 149, § 148B (a). Thus a putative employer like Loomis may rebut the statutory presumption of employment by establishing by a preponderance of the evidence the three prongs of an independent contractor relationship. See G. L. c. 149, § 148B (a) (1)-(3). If Loomis failed to satisfy even one statutory prong, Weiss was Loomis's employee. See Somers, supra at 589-591. The independent contractor statute must be applied in a manner that furthers its purpose to protect workers "from being deprived of the benefits enjoyed by employees through their misclassification as independent contractors." Id. at 592. As a remedial statute, § 148B is entitled to a liberal construction. See Depianti v. Jan-Pro Franchising Int'l, Inc., 465 Mass. 607, 620 (2013).

a. Standing. At all relevant times, Loomis's primary defense was that Weiss, as an individual, lacked standing to bring a misclassification claim. Loomis reasons that because it obtained Weiss's engineering services through its legitimate business-to-business relationship with Eliassen, and Weiss

voluntarily provided services through JoSol, his preexisting corporation and employer, § 148B was inapplicable.  See Chambers v. RDI Logistics, Inc., 476 Mass. 95, 108-109 (2016).  Weiss counters that Loomis contracted for the individual services of Weiss, and used an intermediary, Eliassen, to evade its statutory obligations to its long-term "consultants."  The trial judge did not reach the standing issue; she grounded her directed verdict ruling on Loomis's establishment of Weiss's independent contractor status as a matter of law.  We conclude that the evidence was sufficient to support a finding that Weiss had standing as an individual to assert a misclassification claim under § 148B.[10]

Here, the evidence demonstrated that Loomis contracted with Eliassen not for the services of JoSol, but for "Joel Weiss for technology services."  Asked why Weiss's name appeared on the contract, Gidman explained that "the provider of the services is tremendously important [to Loomis] because not all people are the same . . . [and Weiss had] a specific set of expertise and experience [Loomis was] looking for."  In fact, Weiss was the only JoSol employee authorized by Loomis to perform the services

---

[10] As a threshold matter, we note that the Supreme Judicial Court has indicated that "[t]he statutory reference to 'individuals who provide services' . . . does not expressly exclude individuals who provide services through a corporation." Chambers, 476 Mass. at 109.

in issue.  Weiss provided his personal services to Loomis for three years, working forty to sixty hours per week.  Due to time constraints and the contractual restriction that Loomis imposed on Weiss's work for others, a jury could find that the services of Weiss, the alleged independent contractor, were not "actually available to entities beyond [Loomis], even if they [were] purport[ed] to be so."  Chambers, 476 Mass. at 109, quoting Advisory 2008/1, Attorney General's fair labor and business division.  Although other factors could support a finding of a legitimate business-to-business relationship exempt from liability under § 148B, the factual issue should have been submitted to the jury.[11]  See Chambers, supra at 96, 108-109 (treating standing as question of fact).

b.  Independent contractor status.  Weiss argues that the jury could reasonably have found that Loomis failed to establish one or more of the statutory prongs of § 148B.  We agree.

---

[11] All parties agreed that Loomis, Eliassen, and JoSol were legitimate businesses.  The fact that Loomis obtained Weiss's services through a contract with a legitimate staffing company did not automatically render § 148B inapplicable.  See Sebago v. Boston Cab Dispatch, Inc., 471 Mass. 321, 328-329 (2015) (noting that employer end runs around their G. L. c. 149 obligations through contractual arrangements with third parties are prohibited); Depianti, 465 Mass. at 622 (finding that language in G. L. c. 149, § 148B [a] [1] "does not reflect any legislative intent to allow an employer to insulate itself from liability for misclassification by causing or creating another entity to contract with its employees").

i.   Freedom from control and direction.   Based on the evidence presented, the jury could have reasonably found that Weiss was subject to Loomis control and direction, both under his contract for the performance of the services, and in fact. The issue turns on whether Loomis had the right to supervise, direct, and control the details of Weiss's performance, or whether Weiss was free from supervision "not only as to the result to be accomplished but also as to the means and methods that are to be utilized in the performance of the work" (citation omitted).   Athol Daily News v. Board of Review of the Div. of Employment & Training, 439 Mass. 171, 177 (2003).

Here, JoSol's contract with Eliassen restricted Weiss's ability to perform services for others that might have interfered with his work at Loomis.   Before agreeing to the engagement, Loomis supervisors interviewed Weiss.   McGuire gave Weiss assignments and directions, and actively supervised the performance of Weiss's services from McGuire's office directly across from Weiss's cubicle.   Weiss brought McGuire his "issues" and attended meetings where progress was discussed.   E-mails established that Weiss and McGuire frequently communicated and discussed the technical details of projects.   As part of his daily job, Weiss performed required tasks for other Loomis managers.   Loomis also provided Weiss with a workstation and the supplies and equipment he needed to perform the services.   In

order to get paid, Weiss was required to submit his hours weekly to his supervisor at Loomis for approval. Loomis paid Weiss by the hour, not by the project, and had the authority to grant raises. Loomis monitored and limited Weiss's hours, and terminated Weiss at will without reason. This evidence was sufficient to support a finding of control under the Athol Daily News standard, precluding a directed verdict in Loomis's favor.[12] See Athol Daily News, 439 Mass. at 177.

ii. Usual course of business. In assessing whether services are performed outside the usual course of business of the company, one relevant factor is whether the services are necessary or merely incidental to the business. See Carey v. Gatehouse Media Mass. I, Inc., 92 Mass. App. Ct. 801, 807 (2018). "[A] service need not be the sole, principal, or core product that a business offers its customers . . . in order to be furnished in the usual course of that business." Id. at 808. "[T]he manner in which a business defines itself" is another relevant factor in the usual course of business inquiry. Id. at 805. The Supreme Judicial Court has illustrated the concept of services provided within the employer's usual course of business

[12] The language of JoSol's contractor agreements with Eliassen, while relevant, is not dispositive on the right of control issue. See Boston Bicycle Couriers, Inc. v. Deputy Director of the Div. of Employment & Training, 56 Mass. App. Ct. 473, 483-484 (2002).

with three examples: an art instructor providing services on a "regular or continuous basis" within an art museum; musicians performing as a "usual and customary activity" of a beer bar; and an organist playing music as a "usual part of" a funeral home's business (citations omitted). Athol Daily News, 439 Mass. at 179. We conclude that the jury applying these principles could have found that Weiss performed services within the usual course of Loomis's business.

Loomis is in the business of managing and investing money for its clients. The jury could have found that Loomis maintained a large technology group as part of its normal operations; and that Loomis staffed it on a regular and continuous basis with a significant number of independent contractors. Indeed, according to one Eliassen recruiter, the contractors never finished at Loomis. The contractors provided the technology services needed by Loomis's investment professionals, working full time for years on assignments from their Loomis managers. There was intermingling within the technology group to the point that neither Loomis employees nor contractors knew whether they were interfacing with fellow employees or independent contractors.

Moreover, Loomis publicly advertised the vital role played by the technology group in the success of its business.[13] Gidman, Loomis's CIO, acknowledged that the highly regulated investment industry and the sophistication of its clients "place[ed] demands" on Loomis for a deep infrastructure; information and technology is a required component of that infrastructure; and that the work of the technology group is "important to the operation of Loomis."  Finally, Gidman specifically included the services performed by Weiss and the contractors among the accomplishments of the technology group in the annual reports to the board of directors.  This evidence would have amply supported a finding that Weiss performed services within the usual course of Loomis's business.

iii.  Independently established business.  "The critical inquiry under this prong is whether 'the worker is capable of performing the service to anyone wishing to avail themselves of the services or, conversely, whether the nature of the business

---

[13] On its website, Loomis listed technology as a specific group within the organization.  Under the "Careers" section, Loomis described the role served by the group as follows: "Technological leadership and an ongoing commitment to operating efficiency can significantly impact a firm's financial success. With that mission in mind, the technology group partners with every person, team and department at Loomis Sayles to ensure our most efficient processes and best tools are in place for the task at hand.  The ideal candidate for positions in technology will have the knowledge and experience needed to develop and/or support technology solutions throughout the company."

compels the worker to depend on a single employer for the continuation of the services.'" Sebago v. Boston Cab Dispatch, Inc., 471 Mass. 321, 336 (2015), quoting Athol Daily News, 439 Mass. at 181. Stated differently, the question is whether at the time the services were provided, the individual was "wearing the hat" of the putative employer or the "hat of his own independent enterprise." Boston Bicycle Couriers, Inc. v. Deputy Director of the Div. of Employment & Training, 56 Mass. App. Ct. 473, 480 (2002). "Essentially, [this prong] requires the [putative employer] to demonstrate that the worker is performing services as an entrepreneur" (citation omitted). Subcontracting Concepts, Inc. v. Commissioner of the Div. of Unemployment Assistance, 86 Mass. App. Ct. 644, 649 (2014). The determination whether this statutory prong is satisfied "must be based upon a comprehensive analysis of the totality of relevant facts and circumstances of the working relationship. No one factor is outcome-determinative." Boston Bicycle Couriers, Inc., supra at 484. We need not repeat the evidence that would establish that Loomis did not, as a matter of law, necessarily meet its evidentiary burden with respect to this prong. Suffice it to say that a jury could have found that in reality, Weiss was not free to provide services to anyone of his choice; and that the hat he wore for three years through fifteen different projects had a Loomis label on it. Of particular significance

was the restriction inserted by Loomis in the contract that Weiss was only free to work for others "so long as such actions [did] not impair [his] ability to perform his . . . services to Loomis Sayles."

In sum, in order to prevail, Weiss had to prevail on only one of the statutory prongs, and there was evidence from which the jury could have found in favor of Weiss on each of the statutory prongs.  At the time the trial judge granted the motion for a directed verdict on the misclassification claim, Loomis had not proven that Weiss was an independent contractor as a matter of law.  The verdict was directed in error.  A new trial on the misclassification claim will be required.

Conclusion.  The judgment on the directed verdict is reversed and the case is remanded to the Superior Court for further proceedings consistent with this opinion.

So ordered.