SUPERIOR COURT 
 
 COMMONWEALTH v. ETHAN ISERT

 
 Docket:
 2381CR00217
 
 
 Dates:
 December 26, 2023
 
 
 Present:
 Kenneth W. Salinger
 
 
 County:
 MIDDLESEX
 

 
 Keywords:
 DECISION AND ORDER DENYING DEFENDANT’S MOTION TO DISMISS OR TO MAKE AN INTERLOCUTORY REPORT
 
 

 Ethan Isert has been indicted for unlawful possession of a loaded firearm, unlawful possession of ammunition, two counts of assault with a dangerous weapon (using the firearm), and illegally discharging a firearm withing 500 feet of a building. The indictments allege that Isert committed these crimes in September 2021, when Isert was 18-years old.

Mr. Isert has moved to dismiss the firearm, loaded firearm enhancement, and ammunition indictments. Isert contends that he may not be indicted for possessing a firearm outside his home without a license, or possessing ammunition without a firearm identification (“FID”) card, because the Massachusetts licensing statutes in effect at the time violated the Second Amendment to the United States Constitution, and unchanged aspects of those statutes are still unconstitutional. In the alternative, Isert asks the Court to report these issues for interlocutory review under Mass. R. Crim. P. 34.

The Court will deny Isert’s motion to dismiss. The requirements that Isert obtain a license to carry a firearm or an FID card were enforceable when Isert allegedly committed these offenses, which means he may constitutionally be charged with illegally possessing a firearm and ammunition.

None of Isert’s constitutional challenges to the firearm licensing statutes has merit. Although recent Supreme Court precedent establishes that the “good reason” requirement of the prior license-to-carry statute was unconstitutional, this provision was severable and the rest of the statute was and is lawful. The separate provisions authorizing denial of a license or FID card to an applicant who is unsuitable because they may create a risk to public safety do not unconstitutionally grant open-ended discretion to deny a gun license or permit. Finally, these unsuitability provisions, and the further provision barring people younger than age 21 from obtaining a license to carry, are consistent with the Nation’s historical tradition of barring firearm possession by people or groups

-1-

of people who are likely to pose a danger if they had a gun, and thus are lawful under the Second Amendment.

In the exercise of its discretion, the Court will also deny Isert’s request to report the questions of law raised by Isert’s motion for interlocutory review because the other indictments must still be resolved and an interlocutory appellate decision in Isert’s favor would have little impact on the scope of any trial.

1. Facial Constitutional Challenge. Isert contends that the Supreme Court’s decision in New York State Rifle & Pistol Ass’n, Inc. v. Bruen, 597 U.S. 1 (2022), establishes that the Massachusetts firearm licensing statute was and is unconstitutional. Since Isert never applied for a license or FID card, his arguments constitute a claim that the Massachusetts firearm licensing statute was unconstitutional on its face, not a claim that the particular manner in which it is being applied to him is unlawful. See, e.g., Commonwealth v. Johnson, 461 Mass. 44, 58 (2011). The Second Amendment to the United States Constitution protects the right of “ordinary, law-abiding citizens” to “possess handguns in their home for self- defense” and to “carry handguns publicly for their self-defense.” Bruen, 597 U.S. at 8. More succinctly, the Second Amendment protects “ ’the right of law- abiding, responsible citizens to use arms’ for self-defense.” Id. at 26, quoting District of Columbia v. Heller, 554 U.S. 570, 635 (2008). The Second Amendment applies to the States through the Fourteenth Amendment. See McDonald v. City of Chicago, Illinois, 561 U.S. 742, 749–750 (2010). “The Second Amendment was adopted in 1791; the Fourteenth in 1868.” Bruen, supra, at 34.

In last year’s Bruen decision, the Supreme Court mandated a new standard for evaluating whether firearms licensing rules are permitted under the Second Amendment to the United States Constitution. The Court directed that, “[w]hen the Second Amendment’s plain text covers an individual’s conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation’s historical tradition of firearm regulation.” Bruen, 597 U.S. at 24.

Bruen involved an as-applied challenge to New York’s firearm licensing statute, by two individuals who applied for unrestricted licenses to carry a handgun in public, and whose applications were denied. 597 U.S. at 15–16.

In contrast, Mr. Isert never applied for a license to carry a firearm, or for a firearm identification card. As a result, he has standing to argue that the

-2-

Massachusetts firearm licensing statute (including its age requirement) is unconstitutional on its face, but he cannot claim that the unsuitability provision would be unconstitutional if applied to his particular circumstances. See Johnson, 461 Mass. at 58. In other words, he may press a facial challenge but not an as-applied challenge to the constitutionality of the Massachusetts statutory scheme. See Commonwealth v. Harris, 481 Mass. 767, 771 & n.5 (2019).

Even after Bruen, a plaintiff who asserts a facial challenge to the constitutionality of a firearm licensing scheme “must ‘establish that no set of circumstances exists under which the [law] would be valid,’ or show that the law lacks ‘a plainly legitimate sweep.’ “ Antonyuk v. Chiumento,   F.4th    ,  2023 WL 8518003, at *23 (2d Cir. Dec. 8, 2023), quoting Americans for Prosperity Foundation v. Bonta, 141 S.Ct. 2373, 2387 (2021) (these standards apply to facial challenges not brought under First Amendment overbreadth doctrine), quoting in turn United States v. Salerno, 481 U.S. 739, 745 (1987), and Washington State Grange v. Washington State Republican Party, 552 U.S. 449 (2008).

“In other words, ‘[a] facial challenge is really just a claim that the law or policy at issue is unconstitutional in all its applications.’ “ Antonyuk, supra, quoting Bucklew v. Precythe, 139 S.Ct. 1112, 1127 (2019).[1]

Although “classifying a lawsuit as facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated …[,] the substantive rule of law necessary to establish a constitutional violation” is the same whether a plaintiff asserts a facial or an as-applied challenge to the constitutionality of a statute. See Bucklew, 139 S.Ct. at 1127. Thus, if a facial challenge to a gun licensing statute implicates the Second Amendment, the government must show that the statute “is consistent with the Nation’s historical tradition of firearm regulation.” See Bruen, 597 U.S. at 24. Isert does not face a special burden of proof because he is making a facial challenge that the Massachusetts licensing statute violates the Second Amendment. 

2. “Good Reason” Requirement. Up until 2022, applicants could not obtain a Massachusetts firearm license unless they had “good reason” for carrying a firearm in public. Bruen makes clear that requirement was unconstitutional. But

--------------------------------------------

[1] The distinction between facial and as-applied challenges to  the  constitutionality of a statute did not matter in Bruen because the Supreme Court held that there were no circumstances under which New York’s “proper cause” requirement could be applied without violating the Second Amendment. See Bruen, 597 U.S. at 11, 71.

-3-

the requirement was severable, so it did not make the rest of the licensing statute unenforceable.

2.1. The “Good Reason” Provision Was Unconstitutional. At the time that Isert was allegedly in possession of a loaded firearm, the licensing statute provided that police chiefs could \ issue firearms licenses only to people with “good reason to fear injury to the applicant or the applicant’s property or for any other reason, including the carrying of firearms for use in sport or target practice.” See G.L.  c.  140, § 131(d), first paragraph, as amended by St. 2014,  c. 284, § 48.

Bruen stuck down a very similar “proper cause” requirement that was part of New York’s firearm licensing statute. New York required anyone seeking an unrestricted license to carry a firearm outside their home to prove that they had a “proper cause” for doing so. Bruen, 597 U.S. at 12, quoting N.Y. Penal Law Ann. § 400.00(2)(f). To show “proper cause,” applicants had to “demonstrate a special need for self-protection distinguishable from that of the general community,” which generally required evidence “of particular threats, attacks or other extraordinary danger to personal safety.” Id. at 12–13, quoting In re Klenosky, 75 App.Div.2d 793, 428 N.Y.S.2d 256, 257 (1980), and In re Martinek, 294 App.Div.2d 221, 222, 743 N.Y.S.2d 80, 81 (2002).

The Supreme Court held that New York’s “proper cause” requirement violated the Second and Fourteenth Amendments because it “prevents law-abiding citizens with ordinary self-defense needs from exercising their right to keep and bear arms.” Bruen, 597 U.S. at 71.

Mr. Isert contends, the Commonwealth concedes, and the Court agrees that the holding in Bruen establishes that the Massachusetts requirement that an applicant have a “good reason” to obtain a license to carry violated the Second Amendment. The Supreme Court specifically noted that the Massachusetts “good reason” requirement was an analogue to the New York “proper cause” standard that Bruen held was unconstitutional. See Bruen, supra, at 15 & n.2.

The Legislature promptly responded to Bruen by eliminating the “good reason” requirement. Within weeks after Bruen was issued (on June 23, 2022), the Legislature amended the firearm licensing statute to strike the “good reason” provision; the statute now says that a police chief “shall issue” a firearm license “if it appears that the applicant is neither a prohibited person nor determined to be unsuitable to be issued a license as set forth in this section.” See G.L. c.

-4-

140, § 131(d), first paragraph, as inserted by St. 2022, c. 175, § 7. This amendment took effect on August 10, 2022.

2.2. The “Good Reason” Provision Was Severable. Though the firearm licensing statute that was in effect when Isert allegedly possessed a firearm included a “good reason” requirement that was unconstitutional on its face, it does not follow that Isert was free to carry a firearm in public in Massachusetts without first obtaining a firearm license. The Court concludes that this licensing requirement was severable.

“When part of a statute is held unconstitutional,” courts must severe the unconstitutional portion and enforce the rest of the statute, so long as “the invalid portion is capable of separation” and upholding the rest of the statute would not “frustrate the legislative purpose.” K.J. v. Superintendent of Bridgewater State Hospital, 488 Mass. 362, 374 (2021) (internal quotation marks and citations omitted). Indeed, the Legislature has directed that “[t]he provisions of any statute shall be deemed severable, and if any part of any statute shall be adjudged unconstitutional or invalid, such judgment shall not affect other valid parts thereof.” G.L. c. 4, § 6, clause Eleventh.

The principle that unconstitutional statutory provisions may be severable applies with full force to statutes that impose or may result in criminal liability.[2] See, e.g., Commonwealth v. Brown, 466 Mass. 676, 680–689 (2013) (severing unconstitutional provision making juvenile convicted of murder ineligible for parole from lawful requirement that such a defendant be sentenced to life in prison); Commonwealth v. Baird, 355 Mass. 746 (1969) (severing unconstitutional statutory provision making it a crime to exhibit items used to prevent conception, which violated First Amendment, from other provisions that prohibited giving away such articles); Commonwealth v. Petranich, 183 Mass.

--------------------------------------------

[2]  During  oral  argument,  Isert  suggested   that   Commonwealth   v.   Gagnon, 387 Mass. 768 (1982) (“Gagnon II”), holds that an unconstitutional provision in a criminal statute may never be severed, and therefore no part of an unconstitutional criminal statute may ever be enforced. That is not correct. Gagnon I invalidated G.L. c. 94C, § 32(a), part of the controlled substances act, after an amendment made it unconstitutionally vague. See Commonwealth v. Gagnon, 387 Mass. 567, 569–574 (1982). On rehearing, the Supreme Judicial Court rejected a proposed “rule of revival,” holding that it could not revive the prior version of the statute. See Gagnon II, 387 Mass. at 769–772. But the SJC made clear that this had nothing to do with whether an unconstitutional statutory provision is severable. Id. at 769 & n.2.

-5-

217, 220–221 (1903) (affirming conviction for selling wine made in New York without a license, after severing statutory provision that allowed sale of wine or cider made in Massachusetts without a license because it violated Commerce Clause of the United States Constitution).

The severability doctrine applies here. The “good reason” requirement was capable of separation because it “operate[d] independently” from the separate provisions that permitted denial of a license to someone who was unsuitable because they would likely pose a threat to public safety if armed (discussed in § 3 below) or that made certain categories of people ineligible to obtain a license (such as those under the age of 21, as discussed in § 4 below). Cf. K.J. v. Superintendent, 488 Mass. at 374; Chambers v. RDI Logistics, Inc., 476 Mass. 95, 104 (2016). And severing the “good reason” requirement would not frustrate the apparent legislative purpose, because the Legislature has expressed a preference for severing unconstitutional statutory provisions, see G.L. c. 4, § 6, clause Eleventh, and because this provision was “not so entwined” with the rest of the statute “that the Legislature could not have intended that the part otherwise valid should take effect without the valid part,” see Peterson v. Commissioner of Revenue, 444 Mass. 128, 137–138 (2005), quoting Boston Gas Co. v. Department of Pub. Utils., 387 Mass. 531, 540 (1982).

The Court therefore concludes that the “good reason” requirement was severable from the rest of the firearm licensing statute. As a result, Isert was still required to have a license before carrying a firearm outside his home or place of business. He therefore may be prosecuted for failing to do so, notwithstanding the fact that the “good reason” provision was unenforceable.

3. “Unsuitable” Applicants. Isert’s challenge to the statutory provision authorizing licensing authorities to deny a license-to-carry to “unsuitable” applicants fails. This provision is constitutional. It does not grant unlawfully unfettered discretion to licensing authorities, and it is consistent with the Nation’s history and tradition of firearms regulation.

3.1. This Limited Discretion Is Constitutional. Isert contends that the statute permits police chiefs to exercise “open-ended” discretion to deny a license to carry to anyone that they think is unsuitable. He argues that, as a result, this “suitability requirement runs afoul of Bruen because it permits subjective determinations to control whether a person can exercise their constitutional right to keep and bear arms.” The Court disagrees.

-6-

3.1.1. Unsuitability Is Limited to Public Safety Concerns. In characterizing the scope of discretion available to police chiefs under the firearm licensing statute, Isert relies on Massachusetts case law from 2013 and earlier, without acknowledging that the Legislature materially changed the statute in 2014.

The firearm licensing statute used to provide that a licensing authority “may issue” a firearm license “if it appears that the applicant is a suitable person to be issued such license,” and none of the provisions making someone automatically ineligible applied. See Firearm Records Bureau v. Simkin, 466 Mass. 168, 172 n.8 (2013), quoting G.L. c. 140, § 131(d), as in effect in 2013. The statute did not define the term “suitable person,” or otherwise specify what factors were relevant in deciding whether someone could be deemed “suitable” to carry a firearm. Simkin, supra, at 180. “Further, the limits of unsuitability [had] not been clearly established by our case law.” Id. As a result, the “suitable person” standard gave the licensing authority “broad discretion in making a licensing decision.” Chardin v. Police Comm'r of Boston, 465 Mass. 314, 316 (2013).

But the Legislature amended the license-to-carry statute (effective January 1, 2015) to cabin this discretion and allow for the denial or revocation of a license on the ground that someone is “unsuitable” to carry a firearm only if they pose a “risk to public safety.” See G.L. c. 140, § 131(d), last paragraph, as inserted by St. 2014, c. 284, § 48); see also Chief of Police of Taunton v. Caras, 95 Mass. App. Ct. 182, 184 (2019) (amendment took effect January 1, 2015). This amendment eliminated the reference to “a suitable person,” and replaced it with a provision stating that a licensing authority “may deny the application or renewal of a license to carry … if, in a reasonable exercise of discretion, the licensing authority determines that the applicant or licensee is unsuitable to be issued or to continue to hold a license to carry.” Id. The revised statute also provides that a determination of unsuitability may be based only on credible information or existing factors suggesting that “the applicant or licensee may create a risk to public safety,” required that the grounds for any determination of unsuitability be stated in writing, and specified that the denial or revocation of a license “based on a determination of unsuitability” is subject to judicial review. See § 131(d), last paragraph, as inserted by St. 2014, c. 284, § 48.

At the same time, the Legislature made similar changes to the statute governing firearm identification cards, which allow a holder to possess a firearm at their home of place of business, or to possess ammunition anywhere. (See § 4 of this decision, below.) The amended statute provides that if a licensing authority believes that an applicant is “unsuitable” to obtain an FID card, based on

-7-

credible information or existing factors suggesting that the person could create a risk to public safety, they may file a court petition requesting that the application be denied. See G.L. c. 140, § 129B(1 1/2)(a) to (d), as rewritten by St. 2014, c. 284, § 30.

Under these revised statutory standards, a denial or revocation of a firearm license on grounds that the applicant or license holder is “unsuitable” will be upheld as reasonable only “where the conduct in question suggested public safety risks,” and will be struck down where the licensee’s behavior “did not implicate public safety concerns.” Caras, 95 Mass. App. Ct. at 186.

3.1.2. Bruen Does Not Forbid All Discretionary Judgments. The limited statutory discretion to determine whether an applicant or licensee is “unsuitable” to carry a firearm, because some credible information or existing factor suggests that they may pose a public safety risk, does not violate the Second Amendment as construed in Bruen.

Bruen made clear that firearm licensing schemes are constitutional if they require no showing of “an atypical need for armed self-defense” (unlike the New York “proper cause” or Massachusetts “good reason” requirements)— even if they do “require applicants to undergo a background check or pass a firearms safety course … designed to ensure only that those bearing arms in the jurisdiction are, in fact, ‘law-abiding, responsible citizens.’ ” Bruen, 597 U.S. at 38 n.9, quoting Heller, 554 U.S. at 635.

If a Legislature authorizes a background check to ensure that someone applying for a firearm license is a law-abiding, responsible citizen, it cannot possibly “conceive in advance each and every circumstance in which a person could pose an unacceptable danger to the public if entrusted with a firearm.” Chief of Police of City of Worcester v. Holden, 470 Mass. 845, 859 (2015), quoting Kuck v. Danaher, 822 F.Supp.2d 109, 129 (D.Conn. 2011) (upholding Connecticut’s “suitable person” requirement).

Not surprisingly, therefore, Bruen “did not establish a new rule forbidding all discretionary judgments in firearm licensing.” Antonyuk,  2023 WL  8518003, at *34. To the contrary, when Bruen indicated that the 43 States with what it characterized as “shall-issue” licensing regimes had acted constitutionally in creating and enforcing their statutory requirements, see Bruen, supra at 13 and n.1, and 38 n.9, it included States and cited to State statutes that “confer some measure of discretion on licensing officers” to determine whether an applicant

-8-

is a “suitable person,[3]” has “good moral character,[4]” is likely to pose a danger to themselves or to others if issued a permit,[5] “chronically or habitually abuse[s] a controlled substance to the extent that his or her normal faculties are impaired,” or suffers from some mental infirmity, instability, or disorder that may make them dangerous.[6] See Antonyuk, supra, at *32 & n.44.

Bruen expressly approved state licensing schemes that include a “suitable person” requirement very similar to the Massachusetts provision that a firearm license may be denied if the applicant is unsuitable because they pose a threat to public safety. Bruen made clear that the “suitable person” requirement in Connecticut law did not raise any Second Amendment concerns because, “[a]lthough Connecticut officials have discretion to deny a concealed-carry permit to anyone who is not a ‘suitable person,’ see Conn. Gen. Stat. 29-28(b), the ‘suitable person’ standard precludes permits only to those ‘individuals whose conduct has shown them to be lacking the essential character of temperament necessary to be entrusted with a weapon.’” Bruen, 597 U.S. at 13 n.1, quoting Dwyer v. Farrel, 193 Conn. 7, 12 (1984). And though Rhode Island also requires that an applicant be “a suitable person to be licensed,” R.I. Gen. Laws § 11-47-11; the Supreme Court said that this statute is constitutional because it does not require “[d]emonstration of a proper showing of need.” Bruen, supra, quoting Gadomski v. Tavares, 113 A.3d 387, 392 (R.I. 2015).

Bruen’s discussion of these Connecticut and Rhode Island statutes makes clear that, although “States cannot grant or deny licenses based on suitable need or purpose,” they “may do so based on the applicant having a suitable character or temperament to handle a weapon” safely and appropriately. Antonyuk, 2023 WL 8518003, at *11.

It follows that the Massachusetts provision authorizing denial of firearm licenses to people who are found to be unsuitable because they pose a risk to public safety is allowed under Bruen; this provision does not permit a licensing

--------------------------------------------

[3] Conn. Gen. Stat. § 29-28(b); R.I. Gen. L. § 11-47-11(a).

[4] Del. Code Ann. tit. 11, § 1441(a); Me. Rev. tat. Ann., tit. 24, § 2003(1).

[5] Ala. Code § 13A-11-7(c)(11); Colo. Rev. Stat. Ann. § 18-12-203(2); Iowa Code Ann. § 724.8(3); Minn. Stat. § 624.714 subd. 6(a)(3); Mo. Rev. Stat. § 571.101;  18 Pa. Stat. and Cons. Stat. Ann. § 6109(d)(3) & (e)(1)(I); Tex. Gov’t Code Ann.
§ 411.172(a)(7); Utah Code Ann. § 53-5-704(3)(a); Wyo. Sta. Ann. § 6-8-104(g); Va. Code Ann. § 18-2-308.09(13).

[6] Ga. Code Ann. § 16-11-129(b.1)(3); Mont. Code Ann. § 45-8-321(2).

-9-

authority to exercise any more discretion than in the State licensing schemes expressly approved in Bruen.[7]

3.2. Massachusetts May Keep Firearms and Ammunition from Dangerous People. To the extent that Isert contends that the unsuitable person provisions are barred by Bruen for reasons other than that they permit “discretionary assessments,” that argument is also without merit.

“Like most rights, the right secured by the Second Amendment is not unlimited.” Bruen, 597 U.S. at 21, quoting Heller, 554 U.S. at 626. As noted above, Bruen requires that where “the Second Amendment’s plain text covers an individual’s conduct,” the conduct is “presumptively” protected, unless the government shows that its firearm regulation “is consistent with the Nation’s historical tradition of firearm regulation.” Id. at 24.

The “analogical reasoning” that Bruen holds is necessary under the Second Amendment “requires only that the government identify a well-established and representative historical analogue, not a historical twin. So even if a modern- day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.” Bruen, 597 U.S. at 30 (emphasis in original). For an historical firearm regulation to be “relevantly similar,” and thus justify a modern regulation, the historical and modern regulations must “impose a comparable burden on the right of armed self- defense,” and the burden must be “comparably justified.” Id. at 29. In other

--------------------------------------------

[7] Isert’s reliance on statements about discretion by Justice Kavanaugh in his concurring opinion, which were not adopted by the full Court in Bruen, is misplaced. Where “at least five Justices of the Supreme Court join a single majority opinion that agrees on both the result and the reasoning,” as in Bruen, any “additional thoughts” that a Justice may express in a concurrence “do not bind lower courts.” United States v. Duvall, 740 F.3d 604, 610 (D.C. Cir. 2013) (Kavanaugh, J., concurring in the denial of rehearing en banc) ; accord, e.g., Alexander v. Sandoval, 532 U.S. 275, 285 n.5 (2001) (where five justices joined majority opinion, concurrence does not alter scope or substance of Supreme Court’s decision). Justice Kavanaugh fully joined the majority opinion in Bruen. See 597 U.S. at 79 (“I join the Court’s opinion”). The other justices who wrote concurrences also joined the majority opinion in full. Id. at 71 (Alito, J., concurring) (“I join the opinion of the Court in full”) and 81 (Barrett, J., concurring) (“I join the Court’s opinion in full.”). Since six justices all joined the majority opinion, nothing in Justice Kavanaugh’s concurrence is binding.

-10-

words, courts must compare “how and why the regulations burden a law- abiding citizen’s right to armed self-defense.” Id.

Bruen’s approval of laws that ban firearms from “sensitive places” is a good example. Bruen found that although there were “relatively few 18th- and 19th- century ‘sensitive places’ where weapons were altogether prohibited—e.g., legislative assemblies, polling places, and courthouses,” the Court was also not aware of any “disputes regarding the lawfulness of such prohibitions.” Bruen, 597 U.S. at 30, citing D. Kopel & J. Greenlee, The “Sensitive Places” Doctrine, 13 Charleston L. Rev. 205, 229–236, 244–247 (2018). If one reviews this Kopel & Greenlee article, one learns that the historical record upon which Bruen bases this conclusion consists of one colonial statute in Maryland that barred carrying arms in either house of the legislature, a second colonial statute in Delaware that barred arms near polling places, several State statutes in the 1860s and 1870s that barred arms near polling places, and one statute from that era that barred them from courthouses. Bruen concluded on this basis that “courts can use analogies to those historical regulations of ‘sensitive places’ to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible.” 597 U.S. at 30.

Applying similar analogical reasoning, it is apparent that “[t]he Second Amendment does not preclude states from denying a concealed-carry license based on a reasoned determination that the applicant, if permitted to wield a lethal weapon, would pose a danger to himself, others, or to public safety.” Antonyuk, 2023 WL at *23.

The Nation’s historical tradition of firearm regulation, from both before and just after the adoption of the Second Amendment, includes many laws that barred people believed to be potentially dangerous from possessing guns.[8]

For example, “[i]n colonial America, legislatures prohibited Native Americans from owning firearms.” United States v. Jackson, 69 F.4th 495, 502 (8th Cir. 2023).[9]

--------------------------------------------

[8] See, e.g., Mark Frasetto, Firearms and Weapons Legislation up to the Early 20th Century, at 40–46 (2013) (compiling statutes), available at https://ssrn.com/abstract=2200991 (last visited Dec. 20, 2023).

[9] Citing Michael A. Bellesiles, Gun Laws in Early America: The Regulation  of Firearms Ownership, 1607-1794, 16 Law & Hist. Rev. 567, 578–579 (1998); Act of Aug. 4, 1675, 5 Records of the Colony of New Plymouth 173 (1856); Act of July 1, 1656, Laws and Ordinances of New Netherland, 234–235 (1868); accord Joseph
<continued …>

-11-

The founding generation also imposed “ ’complete bans on gun ownership by free blacks, slaves, … and those of mixed race’ (each of which today would be plainly unconstitutional).” Binderup v. Attorney Gen. United  States  of Amer., 836 F.3d 336, 368 (3d Cir. 2016) (en banc) (Hardiman, J., concurring in part and concurring in the judgments).[10] “Religious minorities, such as Catholics in Maryland, Virginia, and Pennsylvania, were [also] subject to disarmament.” Jackson, supra.[11]

In addition, “[i]n the era of the Revolutionary War, the Continental Congress, Massachusetts, Virginia, Pennsylvania, Rhode Island, North Carolina, and New Jersey prohibited possession of firearms by people who refused to declare an oath of loyalty.” Jackson, 69 F.4th at 503.[12] “Although these Loyalists were neither criminals nor traitors, American legislators had determined that permitting these persons to keep and bear arms posed a potential danger.” Binderup, supra (Harriman, J., concurring), quoting Nat’ Rifle Ass’n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 200 (5th Cir. 2012), abrogated on other grounds by Bruen, 597 U.S. at 18–19 & n.4.

The reason for these bans on firearm possession was that members of these groups were believed to pose a danger to public safety if they obtained arms. Consistent with this understanding, “the influential ‘Dissent of the Minority,’ see Heller, 554 U.S. at 604, published by Anti-Federalist delegates [at the Constitutional Convention] in Pennsylvania, proposed that the people should

--------------------------------------------

Blocher & Caitlan Carberry, Historical Gun Laws Targeting ‘Dangerous’ Groups and Outsiders, Oxford University Press Forthcoming, Duke L. Sch. Pub. L. & Legal Theory Series No. 2020-80, at 4–11 (2023), available at https://ssrn.com/abstract=3702696 (last visited Dec. 20, 2023); Joseph G.S. Greenlee, The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms, 20 Wyoming L. Rev. 1, 14–17 (2020).

[10] Quoting and citing Adam Winkler, Heller’s Catch-22, 56 UCLA L. Rev. 1551, 1562 (2009), citing in turn Saul Cornell, A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America 28–29 (2006).

[11] Citing Bellesiles, supra, at 574; Greenlee, supra, at 263.

[12] Citing 4 Journals of the Continental Congress, 1774–1789, at 205 (Worthington Chauncy Ford ed., 1906); Act of Mar. 14, 1776, ch. 21, 1775–1776 Mass. Acts. 479; Act of May 1777, ch. III, 9 The Statutes at Large; Being a Collection of all the Laws of Virginia, at 281–282 (1821); Act of June 13, 1777, ch. 756, §§ 2–4, 1777 Pa. Laws 110, 111–112; Act of June 1776, 7 Records of the Colony of Rhode Island and Providence Plantations in New England, at 567 (1862); Act of Nov. 15, 1777, ch. 6, 1777 N.C. Sess. Laws 231; Act of Sept. 20, 1777, ch. XL, 1777 N.J. Laws 90.

-12-

have the right to bear arms ‘unless for crimes committed, or real danger of public injury from individuals.’ “ Jackson, supra, quoting 2 Bernard Schwartz, The Bill of Rights: A Documentary History 665 (1971).

“In sum, founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety.” Kanter v. Barr, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting). “The founders didn’t think government should have the power to take away everyone’s guns, but they were perfectly willing to confiscate weapons from anyone deemed untrustworthy—a category so broadly defined that it included a majority of the people.” Adam Winkler, Gun Fight: the Battle over the Right to Bear Arms in America 116 (2011). “And this practice of keeping guns out of the hands of ‘distrusted’ groups continued after the Revolution. For example, many states even constitutionalized the disarmament of slaves and Native Americans.” Kanter, 919 F.3d at 458 (Barrett, J., dissenting).[13]

This history “demonstrates that there is no requirement for an individualized determination of dangerousness as to each person in a class of prohibited persons.” Jackson, 69 F.4th at 504. Furthermore, “[i]n reasoning by analogy from that history, ‘the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated.’ ” Id., quoting Bruen, 597 U.S. at 28. After all, “[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868.” Bruen, supra, at 27.

This historical tradition establishes that Massachusetts may lawfully authorize licensing authorities to deny or revoke firearm licenses for individuals as to whom there is concrete information or more general factors suggesting that they are “unsuitable” to possess a firearm because they may pose a threat to public safety if they were armed. The “how” and the “why” of this part of the Massachusetts firearm licensing statute are consistent with the historical analogues discussed above; barring some from possessing firearms is permitted under the Second Amendment where there is reason to believe they would pose a danger if armed.

And since Massachusetts may lawfully bar unsuitable persons who pose a risk to public safety from obtaining a license to carry a firearm, it follows that it may also bar such persons from obtain an FID card that would allow them to possess

--------------------------------------------

[13] Citing Eugene Volokh, State Constitutional Rights to Keep and Bear Arms, 11 Texas Rev. of L. and Politics 191, 208–209 (2006).

-13-

ammunition. See United States v. Guthery, No. 2:22-cr-00173-KJM, 2023 WL 2696824, at *3-4 (E.D. Cal. March 29, 2023) (upholding Federal prohibition on felon possession of ammunition on basis that “the same [historical] analysis applies to firearms as ammunition given the coextensive nature of the rights”); United States v. Barnes, 22-CR-43 (JPO), 2023 WL  2268129,  at  *2  (S.D.N.Y. Feb. 28, 2023).

4. Age Requirements. The statutory scheme that bars 18-year to 20-year olds from obtaining a license to carry a firearm outside their home, while letting them keep a firearm at home and carry rifles and shotguns elsewhere, is also constitutional because it too is consistent with the Nation’s history and tradition of firearms regulation. At the very least, this provision is constitutional with respect to 18-year olds, and Isert was that age at the time of the offenses alleged in this case. Since this provision is not unconstitutional in all its applications, Isert’s facial challenge fails. See generally Bucklew, 139 S.Ct. at 1127.

4.1. Statutory Background. Massachusetts law permits 18- to 20-year olds to get a firearm identification card that authorizes possessing a handgun in one’s home, as well as carrying a rifle or shotgun in public. See G.L. c. 140, §§ 129B & 129C; G.L. c. 269, § 10(h); Commonwealth v. Fleury, 489 Mass. 421, 433 (2022) (“An FID card entitles the cardholder to possess a rifle or shotgun that is not a large capacity weapon”); Commonwealth v. Powell, 459 Mass. 572, 587 (2011) (“An FID card allows the holder to own or possess a firearm within the holder’s residence or place of business, but not to carry it to or in any other place.”). A minor who is 15 to 17 years old may obtain an FID card with written permission from their parent or guardian. See G.L. c. 140, § 129B(1)(v). And someone under the age of 15 may use a rifle or shotgun for hunting or target shooting if they are “under immediate supervision of a person holding a firearm identification card or license to carry firearms.” G.L. c. 140, § 129C(k).

In contrast, Massachusetts law bars everyone under the age of 21 from obtaining a firearm license to carry a handgun outside of their home or place of business; this provision was in effect in 2021 when Isert allegedly possessed a loaded firearm. See G.L. c. 140, § 131(d)(iv), as inserted by St. 2014, c. 284, § 48; see also, e.g., Commonwealth v. Eberhart, 461 Mass. 809, 810 n.1 (2012) (G.L. c. 269, § 10(a) “generally prohibits the possession of a firearm outside one’s home or business without a license to carry it”); Commonwealth v. Karen K., 491 Mass. 165, 178–179 (2023) (since people under 21 years of age may not obtain license

-14-

to carry firearm, police had reasonable suspicion to stop 16-year old who appeared to be holding firearm in their waistband).

4.2. Historical Analogues. Isert contends that the Massachusetts statute that bars 18-year olds from obtaining a license to carry firearms in public violates the Second Amendment. The Court disagrees.

The historical tradition discussed above that permits States to bar categories of dangerous persons from obtaining a firearm license, including during the Colonial Era just before the Second Amendment was adopted, makes it lawful for Massachusetts to bar 18-year olds (like Isert in September 2021) from lawfully carrying a handgun. Cf. United States v. Rene E., 583 F.3d 8, 15–16 (1st Cir. 2009) (upholding federal ban on juvenile possession of handguns, noting that it is consistent with “longstanding practice,” dating back to “the Founding era,” of legislatures “prohibiting certain classes of individuals from possessing firearms—those whose possession poses a particular danger to the public”).

The Massachusetts age restriction on obtaining a license to carry is also consistent with historical precedent from States that made it unlawful to sell, loan, or deliver handguns and other categories of dangerous weapons to minors younger than age 21 during the years just before the Civil War. See Jones v. Bonta, 2023 WL 8530834, at *8 (S.D. Cal. Dec. 8, 2023) (quoting statutes from Alabama in 1856, Tennessee in 1858, and Kentucky in 1858 that prohibited 18- to 20-year olds from obtaining pistols). The apparent aim of these statutes was “to ensure public safety due to the immaturity of individuals under the age of 21.” Id. The Supreme Court made clear in Bruen, in its discussion of “sensitive places,” that statutes adopted during this period are relevant in determining the scope of the Second Amendment. See Bruen, 597 U.S. at 30.

Though the Commonwealth has not identified any Colonial-era firearm restrictions based on age, that does not mean the Second Amendment requires Massachusetts to let 18-year olds obtain a license to carry a handgun in public. The Commonwealth need only “identify a well-established and representative historical analogue” to age-based licensing restrictions, “not a historical twin.” Bruen, 597 U.S. at 30 (emphasis in original). The Colonial-era tradition of barring distrusted groups of people from possessing firearms, in order to protect public safety, is an historical analogue for the Massachusetts statute that bars those under the age of 21 from carrying a firearm in public.

By way of comparison, the Supreme Court has made clear that its recent decisions construing the Second Amendment as protecting the right of law-

-15-

abiding persons to possess firearms for self-defense do “not cast doubt on such longstanding regulatory measures as ‘prohibitions on the possession of firearms by felons and the mentally ill,’ ” even though it has not identified Colonial or even Nineteenth Century analogues for barring felons or mentally- ill persons from possessing firearms. See McDonald, 561 U.S. at 786, quoting Heller, 554 U.S. at 626. This makes sense, at least with respect to people who have committed violent felonies and whose mental illness makes them pose a danger to others, because such restrictions are consistent with Colonial-era laws that barred people believed to pose a danger to others from possessing firearms. See Kanter, 919 F.3d at 457–458 & 464–469 (Barrett, J., dissenting).

It is now well established that juveniles under the age of 18 “demonstrate a ‘ lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking.’ ” Diatchenko v. Dist. Att'y for Suffolk Dist., 466 Mass. 655, 660 (2013) (further internal quotation marks omitted), quoting Miller v. Alabama, 567 U.S. 460, 471 (2012).

The Legislature could reasonably conclude that 18-year olds (like Isert) are also far too likely to pose a danger to public safety if they were allowed to obtain a license to carry. Another Superior Court judge recently found, based on their evaluation of extensive expert testimony, that the brains of 18- to 20-year-olds “are not as developed as those of older individuals,” this makes then “less able to control their impulses in emotionally arousing situations,” and as a result “[t]heir reactions in these situations are more similar to those of 16 and 17-year- olds than they are to those age 21-22 and older.” Commonwealth v. Robinson and Mattis, Suffolk Sup. Ct. docket nos. 0084CR10975 and 1184CR01129, slip op.  at 21 (July 20, 2022) (Ullmann, J.).[14]

Other courts agree. See, e.g., People v. Profit, 218 N.E.3d 495, 501 (App. Ct. of Ill. 2023) (collecting Illinois decisions addressing “the evolving neuroscience showing that young adults [18 to 21 years old] may have similar brain development to those typically considered juveniles”); Pike v. Gross, 936 F.3d 372, 385 (6th Cir. 2019) (Stranch, J., concurring) (“Recent research in neuroscience and developmental psychology indicates that individuals between the ages of 18 and 21 share many of these same characteristics” that were identified in Miller, including “recklessness, impulsivity, and heedless risk taking.”).

--------------------------------------------

[14] Judge Ullmann’s decision is under review by the Supreme Judicial Court in docket SJC-11693.

-16-

The impulsivity that 18- to 20-year olds share with younger people means that they are far more likely than fully mature adults to pose a danger to others if they were allowed to carry handguns in public. See Jones v. Bonta, 2023 WL 8530834, at *6-*7 (crediting expert testimony that 18- to 20-year olds are “disproportionately prone to violence, including gun violence, compared to older age groups” because they “are more impulsive, more likely to engage in risky and reckless behavior, unduly influenced by peer pressure, motivated more by rewards than costs or negative consequences, less likely to consider the future consequences of their actions and decisions, and less able to control themselves in emotionally arousing situations,” all of which is due to their “still-developing cognitive systems”).

Since the Nation’s historical traditions permit barring categories of potentially dangerous persons from carrying a firearm, and we now know that 18- to 20-year olds generally have the impulsive recklessness that would make them dangerous if they had access to a firearm, the age restrictions in the Massachusetts license-to-carry statute pass muster under the Second Amendment. See Jones v. Bonta, supra, at *6-*11; Reese v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 647 F.Supp.3d 508, 520–525 (W.D. La. 2022); National Rifle Ass’n of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 202 & 204 (5th Cir. 2012) (in light of Founding era regulations “that targeted particular groups for public safety reasons,” federal statute barring firearms dealers from selling handguns to persons under the age of 21 “is consistent with longstanding, historical tradition, which suggests that the conduct at issue falls outside the Second Amendment’s protection”), abrogated on other grounds by Bruen, 597 U.S. at 18–19 & n.4; see also Lara v. Evanchick, 534 F.Supp.3d 478, 486–492 (W.D. Pa. 2021) (collecting post-Heller, pre-Bruen decisions).[15]

--------------------------------------------

[15] The Court respectfully disagrees with contrary conclusions in Brown v. Bureau of Alcohol, Tobacco, Firearms, and Explosives, No. 1:22-CV-80, 2023 WL 8361745, at *12–*15 (N.D. W.Va. Dec. 1, 2023); Fraser v. Bureau of Alcohol, Tobacco, Firearms and Explosives, No. 3:22-CV-410, 2023 WL 3355339, at *19–*22 (E.D. Va. May 10, 2023); Worth v. Harrington, No. 21-CV-1348, 2023 WL 2745673 (D.Minn. Mar. 31, 2023); and Firearms Policy Coalition, Inc. v. McCraw, 623 F.Supp.3d 740, 752– 756 (N.D. Tex. 2022). None of these decisions consider the colonial history of barring gun possession by members of groups that were considered likely to pose a danger to public safety if they were armed.

-17-

Isert’s argument that barring 18- to 20-year olds from obtaining a license to carry a handgun in public cannot be squared with colonial statutes that required young men in that age group to serve in militias misses the mark.

The Massachusetts licensing scheme permits 18-year olds to get an FID card, which would let them carry a rifle or shotgun; the statute therefore does not bar 18-year olds from possessing the kinds of weapons that a member of a colonial militia would typically have been using. Cf. Perpich v. Department of Defense, 496 U.S. 334, 341 n.7 (1990) (the Second Militia Act of 1792, 1 Stat. 271, required every militia member to “provide himself with a good musket or firelock … or with a good rifle,” and appropriate ammunition and powder) (quoting 1 Stat. 271, § 1); Hirschfield v. Bureau of Alcohol, Firearms, Tobacco, & Explosives, 5 F.4th 407, 428 n.28 (4th Cir. 2021), vacated and dismissed as moot, 14 F.4th 322 (4th Cir. 2021) (“Every militia act around the time of ratification required enlistees to bring their own equipment, including a rifle or musket.”). Possessing a long gun under the supervision of officers in a militia is very different from possessing a concealable handgun with no supervision at all. See Jones v. Bonta, 2023 WL 8530834, at *10.

In any case, our understanding of the brain development of 18-year olds like Isert is new. Since there was a colonial tradition of barring gun possession by groups of people who could pose a threat to public safety if they were armed, it is lawful for the Legislature to impose analogous restrictions, and bar 18-year olds from carrying handguns in public, based on contemporary understandings of who may pose such a danger to others if armed in public.

5. Request for Interlocutory Report. Mr. Isert asks, in the alternative, that the Court report its decision or the questions raised by Isert’s motion for interlocutory appellate review. Rule 34 gives the Court discretion to decide whether to report questions of law on an interlocutory basis. See Commonwealth v. Eagleton, 402 Mass. 199, 208 (1988). The Court declines to do so.

The Court concludes that interlocutory review is not appropriate because an interlocutory decision in favor of Isert would result in the dismissal of only some of the indictments in this case, and such a partial dismissal would not meaningfully change the scope of the evidence that the Commonwealth would have to present or the length of any trial.

Though the Commonwealth would no longer have to prove that Isert did not have a license if the firearm and ammunition possession indictments were dismissed, it would still have to prove possession of a firearm and the other

-18-

elements of the indictments for assault with a dangerous weapon and discharging a firearm. At most an interlocutory appellate decision in Isert’s favor would make it unnecessary for the Commonwealth to present 15 or 20 minutes of testimony about whether Isert had a valid firearm license or firearm identification card.

An interlocutory report of a question of law “may be appropriate when the alternatives are a prolonged, expensive, involved or unduly burdensome trial or a dismissal of the indictment.” Commonwealth v. Cavanaugh, 366 Mass. 277, 279 (1974). But trial courts should not make such a report unless an interlocutory appellate decision is not only necessary to resolve “serious questions likely to be material in the ultimate decision,” but would also “substantially facilitate” the “subsequent proceedings in the trial court.” Commonwealth v. Henry’s Drywall, Inc., 362 Mass. 552, 557 (1972), quoting John Gilbert, Jr. Co. v. C.M. Fauci Co. , 309 Mass. 271, 273 (1941).

For example, the possibility that an interlocutory appellate decision might “avoid the necessity of holding what would appear to be a very short trial” does not warrant an interlocutory report. Henry’s Drywall, supra (discharging report and declining to decide interlocutory appeal).

Since an interlocutory appellate decision in favor of Mr. Isert would have little impact on the scope of the remaining trial, and would save very little trial time, the Court concludes that interlocutory review is not appropriate.

ORDER

Defendant’s “motion to dismiss or, in the alternative, request for reservation and report” is denied.